UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

HERBERT PEARROW,

        Plaintiff,

v.

ABBOTT LABORATORIES
d/b/a Abbott Nutrition,

        Defendant.

_____/

Case No. 1:11-CV-1322

HON. GORDON J. QUIST

## OPINION

Plaintiff, Herbert Pearrow, has sued Defendant, Abbott Laboratories, alleging that Abbott violated the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq*., by interfering with, and retaliating against Pearrow's exercise of, his FMLA rights. Abbott argues that it initiated the process of terminating Pearrow prior to Pearrow's request for FMLA leave, and that Abbott had a legitimate, non-retaliatory reason for terminating Pearrow. Abbott has moved for summary judgment. (Docket no. 25.) Abbott has also moved to strike portions of Pearrow's proffered affidavits (docket no. 28-1) as inadmissible. (Docket no. 30.)

For the reasons set forth below, the Court will grant Abbott's Motion for Summary Judgment. The Court will also grant Abbott's Motion to Strike.

### I. BACKGROUND

In 2009, at the time of his termination, Pearrow had been employed by Abbott or its predecessor approximately 28 years. Pearrow had worked in several positions, but during the final year of his employment he was a forklift driver. During the course of his employment, Pearrow's performance evaluations were generally favorable. In 2004, Pearrow received an expectation

letter—a written warning—for failure to pay attention to detail related to an over delivery of corn syrup. In 2006, he received a second letter for failure to pay attention to detail regarding proper scanning and verification of inventory before adding a vitamin to a product batch. In both letters, Pearrow was warned that future violations could lead to further disciplinary action up to and including termination. (Docket no. 26, Page ID 232, 235.)

In 2009, Pearrow had three safety violations within six months. First, in May 2009, Pearrow hit a stationary forklift while operating another forklift. After he hit the forklift, he visually examined the stationary forklift, did not observe any damage, and did not report the incident. The next day, after someone detected damage to the stationary forklift, Pearrow's manager, David Hamlin, approached Pearrow about the incident. At first, Pearrow said that he did not remember the incident. However, Pearrow then said he may have hit the forklift lightly. Pearrow further stated that he was unable to hear the accident because the equipment in the room was loud, he had been wearing earplugs, and he had a head cold. However, he then stated that he did not report it because he had conducted a visual inspection and did not see any damage. At his mid-year performance review, Pearrow was nonetheless given a satisfactory evaluation.

On October 19, 2009, a supervisor observed Pearrow "tunneling," with his forklift. Tunneling is the process of driving a forklift under a pallet that is on a higher rack and/or using a forklift to take a pallet while another pallet is in a rack overhead. Although tunneling was not initially prohibited at Abbott, on October 14, 2009, Abbott forklift operators were informed in a meeting that tunneling was not permitted and could lead to disciplinary action. Pearrow attended that meeting. On October 23, 2009, when Employee Relations investigator Nitorshi Wilson discussed the incident with Pearrow, Pearrow explained that he could not tell he was going under a pallet—or tunneling—until he was midway through the process. When he realized he was under

a pallet, since he was already in the rack, he made the decision to pick the pallet off the floor and bring it out anyway. Wilson considered Pearrow's conduct to be intentional tunneling. Wilson drafted a written warning for Pearrow and sent it to Hamlin on October 27, 2009. However, the written warning was not given to Pearrow because, shortly before it would have been delivered, Wilson learned of another safety violation for which she began additional disciplinary paperwork. Pearrow denies that he intentionally engaged in a safety violation.

On October 22, 2009, Pearrow asked Hamlin for some immediate time off—up to the two weeks of vacation time that he had accumulated. Hamlin stated that he could not accommodate Pearrow's request. The same day, at Pearrow's request, Pearrow met with business human relations senior manager Tracey Nielsen-Trine. They discussed the tunneling incident, then Pearrow's increased anxiety and stress related to his home life. Pearrow explained that he was receiving counseling and asked whether his counselor could authorize leave for an extended period of time. Nielsen-Trine stated that she was not sure if Pearrow's counselor could authorize leave or if a doctor's order would be required. She referred Pearrow to the company's occupational health nurse, Jamie Chapman (then Jamie Carr). That day, Pearrow met with Chapman. He explained his anxiety related to personal matters and how they were affecting his work. Chapman told Pearrow that he should be evaluated by a physician and that he could try to file for FMLA leave. Pearrow told her that Hamlin had refused to give Pearrow time off and Chapman stated that she would speak with Hamlin. On October 22, 2009, Chapman had a lengthy telephone conversation with Hamlin. Chapman told Hamlin that she was concerned about plant safety in light of Pearrow's health circumstances, and informed Hamlin that Pearrow may need a medical leave of absence. (Chapman Aff., Docket no. 28-1, Page ID 749.)

According to Pearrow, between October 22 and October 27, 2009, Pearrow again asked Hamlin for extended time off and Hamlin refused to accommodate him. The parties agree that Hamlin denied Pearrow's request for two weeks vacation time but offered Pearrow a few vacation days in the middle of the week. There is no evidence that Pearrow specifically asked Hamlin for FMLA leave.

On October 27, 2009, Pearrow had his third safety violation in approximately six months. Pearrow unintentionally hit a pedestrian with his forklift, knocking the pedestrian to the floor. On October 28, 2009, material control manager Mary Scott, plant manager Marlene Hernandez, and Nielsen-Trine began discussing the possibility of terminating Pearrow. The same day, logistics manager Terry Holsinger sent Nielsen-Trine, Scott, and Wilson a document of the chronology of Pearrow's violations related to attention to detail and safety. According to Nielsen-Trine, that type of document is prepared when Abbott is moving forward with a termination decision. On November 2, 2009, Wilson created a first draft of an Employee Relations Termination Review Worksheet recommending Pearrow's termination. On November 4, 2009, Wilson created a second draft and provided it to divisional vice president of human resources Deborah Billig. Billig did not approve the draft. Instead, she requested a review of whether Pearrow's safety violations involved intentional misconduct.

On November 5, 2009, Hamlin granted Pearrow's request for a few flex hours off of work to see a doctor. Pearrow later called Hamlin and informed him that the doctor recommended that Pearrow take two weeks off of work. On November 6, 2009, Abbott's Family Medical Leave Center notified Hamlin that Pearrow had reported a short term medical leave beginning November 5, 2009. Pearrow's leave was later extended until December 22, 2009.

On November 17, 2009, Billig received a revised termination worksheet for Pearrow. It confirmed that overhead mirrors had been in place but Pearrow had failed to use the mirrors to check

4

for pedestrians before he struck a pedestrian. Billig was satisfied that the revised termination worksheet addressed the intentional aspects of Pearrow's prior violations related to his collision with a stationary forklift and tunneling. She approved Pearrow's termination the same day.

In accordance with Abbott's policy of waiting to inform employees of termination decisions until after FMLA leave, Hamlin and Nielsen-Trine waited until December 22, 2009 to inform Pearrow of his termination.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

## III. DISCUSSION

A.  Motion to Strike

In opposition to Abbott's Motion for Summary Judgment, Pearrow has submitted two affidavits—one from Pearrow and one from Jamie Chapman. Abbott has moved to strike four segments of the affidavits as inadmissible. First, Abbott argues that the Court should strike paragraph 14 of Pearrow's affidavit, which states:

> In my experience with Abbott Laboratories over the five (5) years of my employment after Abbott Laboratories took over the manufacturing plant where I worked, and for the years that I worked at this facility back to 1981, I became familiar with a custom and practice pertaining to discipline that was utilized at this plant and by Abbott Laboratories. The custom and practice was to first place employees with safety violations on probation prior to termination and/or to offer transfer to another area of job responsibility, prior to termination.

(Pearrow Aff., Docket no. 28-1, Page ID 744.) Abbott argues Pearrow lacks personal knowledge to support paragraph 14. Abbott has also moved to strike a substantially similar paragraph in Chapman's affidavit, paragraph 11, which states that Chapman is familiar with a custom and practice at Abbott of offering a transfer or probationary period prior to termination. (Chapman Aff., Docket no. 28-1, Page ID 750.) Chapman states that the basis of her familiarity is her two years of employment at Abbott.

Federal Rule of Civil Procedure 56(c)(4) states, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Federal Rule of Evidence 602 states in part, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony." Fed. R. Evid. 602.

In this case, neither Pearrow nor Chapman have provided foundational facts for the specific basis of their personal knowledge, such as conversations with employees placed on probation or transferred to other jobs in lieu of termination. Moreover, if the basis of Pearrow's or Chapman's knowledge is hearsay, it would also be inadmissible. *See, e.g.*, *Quaranta v. Management Support*, 255 F. Supp. 2d 1040, 1050 (D. Ariz. 2003) (explaining that information gathered through "talk of the office," does not constitute personal knowledge and is inadmissible hearsay). Therefore, the

Court will grant Abbott's motion to strike with respect to paragraph 14 of Pearrow's affidavit and paragraph 11 of Chapman's affidavit.

Next, Abbott has moved the Court to strike one sentence in paragraph 7 of Chapman's affidavit, which states "I believe that I specifically mentioned that he might require time off under FMLA." Abbott argues that this statement is akin to making a statement upon "information and belief" in an affidavit, rather than personal knowledge. The Court agrees. Although Chapman has personal knowledge of the conversation, she cannot attest to explicitly discussing FMLA leave to Hamlin. Thus, she does not have personal knowledge of that fact. *See Pace v. Capobianco*, 283 F.3d 1275, 1279 (11th Cir. 2002) ("Even if the affidavit is otherwise based upon personal knowledge ... a statement that the affiant believes something is not in accordance with the Rule."); *Carey v. Beans*, 500 F. Supp. 580, 583 (E.D. Pa. 1980) ("[S]tatements prefaced by the phrases, 'I believe' or 'upon information and belief' or those made upon an 'understanding,' are properly subject to a motion to strike.") (citation omitted). Therefore, the Court will grant Abbott's motion to strike that sentence of paragraph 7.

Finally, Abbott has moved the Court to strike paragraph 13 of Chapman's affidavit, which states: "I believe that Mr. Pearrow's employment termination was primarily prompted by his medical leave of absence, not because of his safety violations." Abbott objects that paragraph 13 is not based on sufficient personal knowledge and constitutes an improper lay opinion under Federal Rule of Evidence 701. In response, Plaintiff argues that Rule 701 does not preclude business owners, officers, and employees from offering lay opinion testimony. However, Rule 701 still requires "particularized knowledge that the witness has by virtue of his or her position in the business." *Whitesell Corp. v. Whirlpool Corp.*, No. 1:05-cv-679, 2009 WL 3718613, at *1 (W.D. Mich. Nov. 4, 2009). Here, the parties agree that Chapman was not employed by Abbott in a human resources capacity and Chapman was not involved in the decision to terminate Pearrow. Moreover,

7

Abbott has offered an affidavit from Nielsen-Trine averring that Chapman "did not participate and was not present at any step of [Pearrow's termination] process" and Nielsen-Trine never discussed the decision to terminate Pearrow with Chapman prior to Pearrow's termination. Therefore, the Court finds that Chapman's opinion is not "rationally based on the witness's perception" by virtue of her position of employment. *See* Fed. R. Evid. 701. Abbott's motion to strike paragraph 13 will be granted.

B.      **Motion for Summary Judgment**

The FMLA entitles qualifying employees to take up to twelve weeks of unpaid leave to attend to certain family and medical matters. 29 U.S.C. § 2612(a). Upon return from FMLA leave, an employer must restore an employee to his former job or another position with equivalent pay, benefits, and terms and conditions of employment. 29 U.S.C. § 2614(a)(1). The FMLA also prohibits an employer from retaliating against an employee who exercises his rights under the FMLA. 29 U.S.C. § 2615(a)(2).

The Sixth Circuit has noted that the FMLA provides two different types of claims or theories of liability. *See Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004); *Arban v. West Publ'g Corp.*, 345 F.3d 390, 400–01 (6th Cir. 2003). The first theory is the "entitlement" or "interference" theory, which is based upon the substantive rights created by the FMLA. *Arban*, 345 F.3d at 401. An employer is liable under this theory if it interferes with an employee's FMLA-created right to medical leave or to reinstatement following the leave. 29 U.S.C. § 2615(a)(1) ("It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."). To prevail on this type of claim, an employee need only show that he was denied an entitlement under the FMLA. *Hoge*, 384 F.3d at 244. The employer's intent is irrelevant to such a claim. *Id.*; *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960 (10th Cir. 2002) (observing "'intent of the employer is immaterial'").

8

The second theory of FMLA claim is a "retaliation" or "discrimination" theory, which arises under 29 U.S.C. § 2615(a)(2). That provision states that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." *See also* 29 C.F.R. § 825.220(c) (prohibiting employers from "us[ing] the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions"). Pearrow asserts both types of claims in his Complaint.

### 1. *Interference Claim*

Abbott argues that it is entitled to summary judgment on Pearrow's interference claim because it did not interfere with Pearrow's FMLA rights—it allowed Pearrow to take FMLA leave from November 5 to December 22, 2009. In his deposition, Pearrow concedes that he does not allege he was denied family medical leave under the FMLA for his leave in November and December 2009. Rather, Pearrow's theory appears to be that he was denied his right to be reinstated after his leave. To establish a prima facie claim of FMLA interference, Pearrow must prove that (1) he was an eligible employee, (2) Abbott was an employer as defined under the FMLA, (3) Pearrow was entitled to take FMLA leave, (4) he gave Abbott notice of his intention to take FMLA leave, and (5) Abbott denied Pearrow FMLA benefits to which he was entitled. For purposes of this claim, the parties dispute the fifth element. Abbott argues that Pearrow was terminated for a legitimate, non-retaliatory reason, so Pearrow was not entitled to reinstatement after his leave. Thus, the better approach is to analyze Pearrow's claim as a retaliation claim. If Abbott can establish that Pearrow's termination was legitimate and non-retaliatory, Abbott did not interfere with Pearrow's FMLA right to reinstatement. *See Winterhalter v. Dykhuis Farms, Inc.*, No. 11-1743, 2012 WL 2989238, at *3 (6th Cir. July 23, 2012) (observing the FMLA does "not create a greater right to reinstatement or protection against termination than the employee would receive if he had not taken FMLA leave, but only 'if the employer has a legitimate reason unrelated to the exercise of FMLA rights for

9

engaging in the challenged conduct.'") (quoting *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006)).

    *2.     Retaliation Claim*

The Sixth Circuit has held that the *McDonnell Douglas* burden-shifting framework is applicable to FMLA retaliation claims. *See Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001). Under the *McDonnell Douglas* framework, a plaintiff relying upon indirect evidence must first establish a prima facie case of discrimination. *Id.* If the plaintiff establishes a prima facie case, a presumption of intentional discrimination arises and the burden shifts to the defendant to set forth "'a legitimate, nondiscriminatory reason' . . . for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S. Ct. 2742, 2747 (1993) (emphasis in original) (citations omitted) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S. Ct. 1089, 1094 (1981)). If the defendant meets its burden of production, the plaintiff must then prove by a preponderance of the evidence that the defendant's conduct was motivated by unlawful discrimination rather than by the reasons articulated by the defendant. *See Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 883 (6th Cir. 1996) (citing *Burdine*, 450 U.S. at 252–53, 101 S. Ct. at 1093–94). Notwithstanding the burden-shifting approach, the plaintiff retains the burden of persuasion at all times. *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1390 (6th Cir. 1993) (per curiam). In order to establish a prima facie case of retaliation, a plaintiff must show: (1) he engaged in an activity protected by the FMLA; (2) his employer knew that he was exercising his rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to him; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012).

In this case, the parties dispute the second and fourth elements of Pearrow's prima facie case. First, Abbott argues that it did not have notice that Pearrow was exercising his FMLA rights because Abbott's decision to terminate Pearrow was set in progress by November 4, 2009, and Pearrow did not inform Abbott of his decision to take FMLA leave until November 5–6, 2009. However, Pearrow responds that "[j]ust as an employee can give an employer notice of his request for FMLA-qualifying leave without invoking the FMLA, an employee can give notice sufficient to make his employer aware that he needs FMLA-qualifying leave without using the words 'leave' or 'leave of absence.'" *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 725 (6th Cir. 2003). Pearrow argues that prior to November 4, 2009, he had multiple conversations with his supervisor Hamlin and at least one human resource manager about his anxiety and stress and its affect on the workplace. For example, Pearrow states that during his conversation with Nielsen-Trine he specifically asked her about how to get leave approval—whether it could be approved by his counselor or required a doctor. Moreover, on October 22, 2009, after Pearrow met with Chapman to discuss Pearrow's leave options, Chapman called Hamlin and had a lengthy conversation about Pearrow. Chapman mentioned her concerns about plant safety in light of Pearrow's health condition, and suggested that Pearrow may need a medical leave of absence. Abbott replies that courts have repeatedly held that employees provide insufficient notice of intent to exercise FMLA rights when they merely provide notice of diagnosis of a mental illness. However, the present facts are distinguishable from the cases cited by Abbott. Here, Pearrow had asked for two weeks of leave from Hamlin, had conversations with at least one human resources manager about his stress and anxiety, and specifically inquired about the process for getting authorization for medical leave. Moreover, Chapman had a lengthy conversation with Hamlin about Pearrow's possible medical leave. All of these events occurred no later than October 22, 2009. Thus, despite that Pearrow did not formally request FMLA leave until November 5, Abbott was likely on notice that Pearrow was exercising his FMLA rights.

11

Second, Abbott argues that Pearrow cannot establish a causal connection between Pearrow's protected FMLA activity and his termination. Pearrow argues that the temporal proximity of his return from leave and his firing, which happened on the same day, establishes an "unduly suggestive" causal connection sufficient to make a prima facie showing of discrimination. *Winterhalter v. Dykhuis Farms, Inc.*, No. 1:10-cv-385, 2011 WL 2148524, at * 9 (W.D. Mich. May 31, 2011) (citing *Mastin v. Sysco Food Servs. Inc.*, No. 08-13369, 2010 WL 1339335, at * 6 (E.D. Mich. Mar. 24, 2010); *Bell v. Prefix, Inc.*, 321 F. App'x 423, 426–27, 430 (6th Cir. 2009)). Here, like in *Winterhalter*, the close temporal proximity of firing on the day Pearrow returned from leave is sufficient causal connection for a prima facie case.

Having established a prima facie case, the burden now shifts to Abbott to present a legitimate, non-discriminatory and non-retaliatory reason for terminating Pearrow's employment. Abbott must show that it had an honest belief in the reason for termination. *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012). "'[A]n employer's proffered reason is considered honestly held where the employer can establish it reasonably reli[ed] on particularized facts that were before it at the time the decision was made.'" *Id.* (quoting *Joostberns v. United Parcel Servs., Inc.*, 166 Fed. App'x 783, 791 (2006)).

Here, Abbott argues that it terminated Pearrow because of Pearrow's three serious safety violations, which included circumstances calling into question Pearrow's honesty and integrity because Pearrow may have initially covered up his collision with the stationary forklift and because he admittedly followed through with tunneling once he realized he was engaged in it. Evidence shows that Pearrow had received warnings that future violations could result in disciplinary action, including termination.

Abbott has met its burden by showing that it terminated Pearrow because he committed three safety violations, including hitting a pedestrian with his forklift. Therefore, Pearrow must present

12

evidence showing that Abbott's reason for termination was a pretext for discrimination. Pearrow may establish that the proffered reason was mere pretext by showing that (1) it had no basis in fact, (2) it was not the actual reason for termination, or (3) it was insufficient to explain Abbott's decision to terminate him. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000).

Pearrow argues that Abbott's proffered reason was pretext because it was not the actual reason he was fired. In support of his argument that Abbott terminated his employment in retaliation for exercising his FMLA rights, Pearrow argues that two other employees or "comparators" had more safety violations but were not terminated. Pearrow first argues that Cindy Lantz, another forklift driver under Hamlin's supervision, had significantly more safety violations but was not terminated. Pearrow also argues that Mark Ritter, an Abbott forklift driver, had six safety violations, including three more serious "near miss" violations, but he was not terminated. Moreover, Pearrow argues that Ritter had one failure to report violation but was still not terminated. Abbott responds that Pearrow's proffered comparators were not similarly situated to Pearrow because, with one exception by Ritter, the comparators did not fail to report their violations and their violations did not reflect poorly on their honesty or integrity. Regarding Ritter, the incident involving his failure to report was remedied when Ritter volunteered to serve on the plant safety committee, which required him to take responsibility for being regularly informed on safety issues and commit to not engaging in further safety violations. Additionally, Abbott argues that none of the safety violations by Lantz or Ritter were as serious as Pearrow's violation that resulted in striking a pedestrian. Finally, Abbott notes that Lantz also took several FMLA leaves between 2009 and 2011, so Lantz's situation is not evidence of pretext for interference with or retaliation for exercise of FMLA rights.[1]

---

[1] Although Pearrow does not make the argument, Abbott also argues that the temporal proximity of Pearrow's return from FMLA leave and his termination is "insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual," *Skrajanc*, 272 F.3d at 317.

Pearrow offers no other evidence to support his argument that Abbott's proffered reason for Pearrow's termination was pretext. Standing alone, Pearrow's employee comparators are insufficient to establish pretext by a preponderance of the evidence. Moreover, Abbott's legitimate, non-discriminatory and non-retaliatory reason for terminating Pearrow is consistent with the facts. The Court therefore concludes that no reasonable jury could find in favor of Pearrow.

Therefore,

The Court will grant Defendant's Motion to Strike (docket no. 30) and Motion for Summary Judgment (docket no. 25). A separate order will issue.


Dated: March 28, 2013                             /s/ Gordon J. Quist
                                                GORDON J. QUIST
                                          UNITED STATES DISTRICT JUDGE